# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **J.L. SPOONS, INC.,** *et al.*, | ) | **Case No.  1:04 CV 314** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **Ohio Department of Public Safety,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

This case involves a constitutional challenge to Ohio Administrative Code 4301:1-1-52,

known as "Rule 52."  Rule 52 prohibits the display of nudity and sexual behavior at

establishments operating with a liquor license.  Plaintiffs in this case are three Ohio strip clubs

and a strip-club association.  On February 17, 2004, Plaintiffs filed an action in this Court

seeking to enjoin Defendants, the Ohio Liquor Control Commission, the Ohio Department of

Public Safety and individual members of each agency (together the "State"), from enforcing

sections (A)(2), (B)(2) and (B)(3) of  Rule 52.[1]  Plaintiffs initially asserted both facial and as

---

[1]Ohio Administrative Code 4301:1-1-52 in relevant part:
(A) Definitions as used in this rule:
        (2) "Nudity" means the showing of the human male or female genital, pubic area or
buttocks with less than a fully opaque covering; the showing of the female breast with less than a
fully opaque covering of any part of the nipple and/or areola; the exposure of any device,
costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal
cleft, perineum anal region or pubic hair region; or the exposure of any device worn as a cover
over the nipples and/or areola of the female breast, which device simulates and gives the
realistic appearance of the nipples and/or areola.

applied challenges to Rule 52.  On January 3, 2007, the Court permanently enjoined Defendants from enforcing Rule 52 on the ground that it was facially overbroad.  On appeal, a divided panel of the Sixth Circuit held that Rule 52 is not facially overbroad and reversed.  *J.L. Spoons, Inc., v. Dragani*, 538 F.3d 379, 382 (6th Cir. 2008) (*J.L. Spoons I*).  Following the Sixth Circuit's ruling, Plaintiffs filed a new motion for a temporary restraining order and preliminary injunction, asking the Court to rule on their *as applied* challenge (Doc. #61).  On August 26, 2010, the Court[2] denied Plaintiffs' motion on the ground that their as applied claim was foreclosed by the Sixth Circuit's decision in *J.L. Spoons I* and lifted the stay of the enforcement of Rule 52.  On appeal, the Sixth Circuit held that its decision in *J.L. Spoons I* had not foreclosed Plaintiffs' as applied claim and remanded the case for further proceedings.  *J.L Spoons, Inc., v. Ohio Dept. Of Public Safety*, 509 Fed. Appx. 464, 472 (6th Cir. 2012) (*J.L. Spoons II*).  Accordingly, the issue now

---

(B) Prohibited activities; no permit holder, his agent, or employee shall knowingly or willfully allow in and upon his licensed permit premises any persons to:

     (2) Appear in a state of nudity;

     (3) Engage in sexual activity as said term is defined in Chapter 2907 of the Revised Code. OAC Ann. 4301:1-1-52.

Under Chapter 2907 of the Ohio Revised Code:
(A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.
(B) "Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.
(C) "Sexual activity" means sexual conduct or sexual contact, or both.
ORC Ann. 2907.01.

    [2]This case was initially assigned to Judge Ann Aldrich.  Following Judge Aldrich's death, this case was reassigned to my docket on May 6, 2010.

2

before the Court is whether Rule 52 is unconstitutional as applied to Plaintiffs.

# I.

From the start of this litigation, Defendants have defended Rule 52 primarily on the ground that it was enacted to combat the undesirable secondary effects that result when there is nude dancing at establishments that serve alcohol.  In *J.L. Spoons I,* a divided panel of the Sixth Circuit found that "Rule 52 is a constitutional, content-neutral regulation of the undesirable secondary effects, including prostitution, drug trafficking, and assault, associated with nude dancing in an environment serving alcohol. It is not overbroad."  538 F.3d at 382.  Following the panel's decision, Plaintiffs filed a new motion for preliminary injunction, asking the Court to rule on their as applied challenged.  The Court declined to do so, concluding that the *J.L. Spoons I* decision foreclosed further consideration of Plaintiffs' as applied challenge.  *J.L. Spoons, Inc., v. Collins-Taylor,* 2010 WL 3370184, * 2 (N.D. Ohio, Aug. 26, 2010).  Plaintiffs filed a timely appeal.

On December 27, 2012, the Sixth Circuit reversed the Court's dismissal of Plaintiffs' as applied challenge.  The Sixth Circuit ruled that in *J.L. Spoons I* the prior panel had "simply accepted the established proposition that regulation targeting the secondary effects of strip clubs are presumed constitutional" and, therefore, it had not resolved Plaintiffs' challenge to the secondary effects evidence.  *J.L. Spoons II,* 509 Fed. Appx. at 472.  The panel explained that "[a]lthough laws targeted against secondary effects are presumed constitutional, it is a separate question whether, in a specific situation, there are secondary effects that need to be addressed."

*Id.* at 471.  The panel then discussed two Supreme Court cases in which the Court analyzed laws

targeting adverse secondary effects associated with adult establishments; *City of Renton v.*

*Playtime Theaters, Inc.,* 475 U.S. 41 (1986) and *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000).

*Id.*  In *Renton,* "the [Supreme] Court held that a government may rely on any evidence that is

'reasonably believed to be relevant'" in evaluating adverse secondary effects associated with

adult establishments, including the experiences of "other cities."  *Id.* (citing *Renton,* 475 U.S. at

51-52).  In *Pap's A.M.*, the Court's plurality opinion "reiterated that a government may

reasonably rely on the experience of other jurisdictions relevant to the secondary-effects problem

it is addressing."  *J.L. Spoons II,* 509 Fed. Appx. at 471 (citing *Pap's A.M.,* 529 U.S. at 297)

(O'Connor, J., plurality op.).  The panel determined that "[t]hese cases establish that there is a

general presumption that a government may regulate secondary effects associated with strip

clubs by relying on a body of prior experience."  *Id.*  The panel then recognized that the Supreme

Court has also laid out a procedure for plaintiffs who seek to rebut this presumption.  *Id.*

(quoting *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 453 (2002)) (internal

quotations omitted).  The "procedure" that the panel referred to is the burden-shifting test, set

forth by the Supreme Court's plurality opinion in *Alameda Books,* 535 U.S. at 453.  *Id*. at 472.

Courts, including the Sixth Circuit, apply the test to determine whether a government has a

substantial interest in enacting a regulation targeting secondary effects.  *Id.*  The burden-shifting

test includes three steps:

> [First,] a municipality may rely on any evidence that is 'reasonably believed to be
> relevant' for  demonstrating a connection between speech and a substantial,
> independent government interest. This is not to say that a municipality can get
> away with shoddy data or reasoning. The municipality's evidence must fairly
> support the municipality's rationale for its [regulation]. [Second, i]f [P]laintiffs
> fail to cast direct doubt on this rationale, either by demonstrating that the

> municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. [Third, i]f [P]laintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* (citing *Alameda Books,* 535 U.S. at 438-39 (O'Connor, J., plurality op.) (internal citations omitted).  Because Plaintiffs' evidentiary challenge to the adverse secondary effects of strip clubs had yet to be resolved under the *Alameda Books* standard, the panel remanded the case so that the Court could rule on Plaintiffs' as applied claim.  *Id.* at 465.

Following the Sixth Circuit's decision remanding the case, the Court took testimony on three occasions.  The first hearing, which took place on December 17, 2013 (hereinafter referred to as the "December 17 Evidentiary Hearing"), featured testimony from Dr. Daniel Linz, Dr. Richard McCleary and Agent Andrew Bouza.  Prior to the hearing, Plaintiffs submitted an expert report from Dr. Linz, and the State submitted an expert report from Drs. McCleary and Wendy Rogeczi.  Dr. Linz's report analyzes data from a study he conducted in which he attempted to gauge the impact that Rule 52 has had on adverse secondary effects in the cities of Dayton, Cleveland and Toledo.  Dr. Linz testified that Rule 52 has had little to no effect in reducing adverse secondary effects.  During his testimony, Dr. McCleary questioned the methodology that Dr. Linz used in his study, and he testified that his analysis of Dr. Linz's data shows that Rule 52 has reduced secondary effects crime.

During the December 17 Evidentiary Hearing, the State also presented evidence of crime occurring *within* adult cabarets.[3]  The State presented this evidence through the testimony of

---

[3]Adult cabarets refers to establishments that offer adult entertainment and serve alcohol.

Agent Bouza, Enforcement Agent for the Ohio Department of Public Safety's Investigative Unit

("Investigative Unit").  Agent Bouza testified about criminal activity that he observed while

working undercover in adult cabarets located in Toledo.  Based upon Mr. Bouza's testimony, the

Court asked the State's counsel if the State was advancing the argument that the combination of

alcohol and nude dancing may lead to criminal activity within the premises of adult cabarets.

Counsel confirmed that, in addition to the State's secondary effects justification for enacting

Rule 52, the State was making this argument as an additional rationale to support Rule 52.  The

Court responded that the State should have put the Plaintiffs and the Court on notice.  Counsel

for the State indicated that the State had made this argument in the earlier stages of the

litigation,[4] but that it had not done so following the Sixth Circuit's decision remanding the case

back to this Court.  Accordingly, the Court gave Plaintiffs the opportunity to develop evidence to

counter the State's argument and reconvened the hearing on April 14, 2014, the second

evidentiary hearing in this case (hereinafter referred to as the "April 14 Evidentiary Hearing").

At the April 14 Evidentiary Hearing, Plaintiffs presented the testimony of Greg Flaig and

Jim StJohn.  Messrs. Flaig and StJohn have experience working, on the management side, with

adult entertainment businesses.  Mr. Flaig is the Executive Director of the Owners Coalition (the

"Coalition") in Ohio and the Secretary of the Buckeye Association of Club Executives

---

[4] In response to Plaintiffs' second motion for a preliminary injunction and temporary
restraining order, the State filed a brief in which it argued that Plaintiffs were unlikely to succeed
on the merits because the State had a substantial interest in enacting Rule 52.  (Doc. #71).  In
support, the State pointed to the testimony of Scott Pohlman.  Mr. Pohlman testified at the 2004
preliminary injunction hearing.  At the time of his testimony, he was the Assistant Deputy
Director of the Ohio Department of Public Safety.  *Id.* at 7.  Mr. Pohlman testified that, while
investigating adult cabarets, he witnessed explicit sexual acts take place between dancers and
patrons.  *Id.* at 23.

("BACE").  Mr. StJohn is the President of ACE, the national chapter of BACE, and the Senior Vice-President of Acquisitions for Spearmint Rhino, an adult cabaret operation with twenty-two locations throughout the United States.

Both Messrs. Flaig and StJohn testified that they agree with most of Rule 52's prohibitions, and were only objecting to the portion of Rule 52 that prohibits the showing of the nipple and areola areas of the female breast.  As a result, the Court asked Plaintiffs' counsel if Plaintiffs were only objecting to Rule 52's requirement that dancers wear, at a minimum, pasties.  April 14, 2014 Evidentiary Hearing Transcript, Doc. # 121 ("April Hrg. Tr.") at 119.  Counsel for Plaintiffs responded that while this was Plaintiffs' main objection to Rule 52, "and the thing that is most damaging to the plaintiffs and to their patrons," they were not abandoning their objection to Rule 52's other prohibitions.  *Id*. at 123.  At the end of the hearing, the Court directed counsel to advise the Court as to whether either side intended to introduce additional witnesses to address Rule 52's requirement that dancers wear pasties.  *Id*. at 132.

On April 28, 2014, counsel notified the Court that Plaintiffs intended to call additional witnesses, including Dr. Judith Hanna, a cultural anthropologist and sociologist who researches and writes about art, dance, and society.  The Court therefore scheduled a third, and final, evidentiary hearing for June 19, 2014 (hereinafter referred to as the "June 19 Evidentiary Hearing").  Prior to the hearing, Plaintiffs submitted an expert report from Dr. Hanna.  At the June 19 Evidentiary Hearing, Plaintiffs called, in addition to Dr. Hanna, Judith Molter and Sue Russell, two entertainers who currently work at adult cabarets in Ohio.  All three witnesses testified about the important expressive elements contained in dancing where the breast is fully exposed.

7

## II.

Although it falls within the "outer ambit of the First Amendment's protection," it is well-settled that nude dancing is expressive conduct that is protected by the First Amendment. *J.L. Spoons I,* 538 F.3d at 389 (quoting *Pap's A.M.,* 529 U.S. at 289). The Supreme Court has upheld laws restricting protected speech where the governmental interest in enacting the law is unrelated to the content of the speech. For instance, in *Renton*, the Supreme Court recognized that the government can enact content-neutral time, place and manner regulations that are aimed at ameliorating the deleterious secondary effects of sexually oriented establishments. *Renton*, 475 U.S. at 47. The Supreme Court held that content-neutral time, place and manner regulations of protected speech will survive constitutional scrutiny "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.* (citations omitted). "[The Sixth Circuit] assess[es] the constitutionality [sic] of regulations that purport to ameliorate the deleterious secondary effects of sexually oriented establishments under the intermediate-scrutiny standard announced in *City of Renton v. Playtime Theaters*, 475 U.S. 41, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)." *Entm't Prods., Inc., v. Shelby Cnty., Tenn.,* 721 F.3d 729, 734 (6th Cir. 2013) (citation omitted).

Rule 52 is a content-neutral regulation aimed at ameliorating the adverse secondary effects associated with nude dancing in an environment that sells liquor. *See Renton,* 475 U.S. at 47 (finding that the Renton ordinance is content-neutral because it "is aimed not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community" (emphasis in original)). Furthermore, Rule 52 does not prohibit nude dancing in Ohio. Rather, Rule 52 limits where in Ohio nude dancing can take

8

place, that is, it cannot take place at establishments operating with a liquor license.  Accordingly,

the Court analyzes it as a content-neutral "place" restriction under *Renton.*[5]

The Court first addresses *Renton's* second requirement, whether Rule 52 allows for

reasonable alternative avenues of communication.  The Sixth Circuit has recognized that

"notwithstanding the reasonableness of the state's rationale, the statute must leave 'the quantity

and accessibility of speech substantially intact.'"  *Entm't Prods.*, 721 F.3d at 735 (quoting

*Alameda Books,* 535 U.S. at 449) (Kennedy, J., concurring in judgment).  The Court finds that

this requirement is satisfied.  The "speech" in this case, the expressive messages that are

conveyed by exotic dance where the female breast is fully exposed,  is not in any way

diminished by the absence of liquor.  Plaintiffs' expert, Dr. Hanna, testified that the messages

---

[5] The Court recognizes that in *J.L. Spoons I*, the Sixth Circuit noted that had this Court, in the first round of litigation, struck down Rule 52 on the ground that it violated the First Amendment guarantee of freedom of expression, then the Supreme Court's decision in *Pap's A.M.* would be "directly on-point." *J.L. Spoons I,* 538 F.3d at 383.  In *Pap's A.M.,* the Supreme Court upheld a regulation making it "a summary offense to knowingly or intentionally appear in public in a 'state of nudity.'" *Id.* (quoting *Pap's A.M.,* 529 U.S. at 283). The Sixth Circuit's opinion in *J.L. Spoons I* suggests that because the Court in *Pap's A.M.* evaluated the regulation under the framework set forth in *United States v. O'Brien,* 391 U.S. 367, 377 (1968), then Rule 52 should, in turn, be analyzed under *O'Brien.  See J.L. Spoons I,* 538 F.3d at 383 ("*Pap's A.M.* would be directly on-point and would decide the issue were it not for the fact that the district court struck down Rule 52 on the grounds that it was overbroad, not that it violated the First Amendment guarantee of freedom of expression under *O'Brien.*").  The Court believes that because *Pap's A.M.* and *O'Brien* involved restrictions on conduct (public nudity and burning of draft cards, respectively), rather than restrictions on the time, place or manner of protected speech, Rule 52 should be analyzed under *Renton.*  Sixth Circuit cases post-*J.L. Spoons I* suggests that this is the appropriate approach.  *See Richland Bookmart, Inc. v. Knox Cnty., Tenn.*, 555 F.3d 512, 523 (6th Cir. 2009) ("[O]ur first step is to determine whether the [ordinance] purports to be a regulation of conduct that incidentally burdens expression (as in *O'Brien*), a time, place, or manner regulation targeting secondary effects (as in *Renton*), or a regulation comprising both (as in *Pap's A.M.*)").  Furthermore, while the Court applies *Renton,* it adheres to the Sixth Circuit's position that "the *O'Brien* and *Renton* inquiries embody much the same standards." *Id.* at 521 (internal quotation and citation omitted).

that are expressed by nudity in exotic dance are unrelated to the consumption or availability of

alcohol on the premises:

> **The Court:** And the -- the freedom and expressiveness that that dancer is creating, in that mood, in an ambience, fantasy, eroticism, all the things you testified to, alcohol has nothing to do with that, right?
>
> **Dr. Hanna:** Well in the sense that it makes people – I mean a lot of people just want to drink to relax.  So that creates the ambience.
>
> **The Court:** Well, so are you saying that – well, what is the expression? Is it the drinking or the nudity?
>
> **Dr. Hanna:** Well it's the nudity is the expression.
>
> **The Court:** All right.
>
> **Dr. Hanna:** And the alcohol, whether somebody's drinking a coke or a beer, is irrelevant.
>
> **The Court:** All right. That's my point. It's irrelevant to the dancer, and it's irrelevant to the patron, correct.
>
> **Dr. Hanna:** But a lot of patrons want to have a drink.  I mean most people who go out at night do.
>
> **The Court:** But that's independent. You can go out and have a drink because you want to socialize with your friends or just have a drink.
>
> **Dr. Hanna:** Right.
>
> **The Court:** There's no freedom of – there's no freedom of expression or eroticism or fantasy or whatever with having a beer or a vodka, right?
>
> **Dr. Hanna:** Right.
>
> **The Court:** The expression, the fantasy, the eroticism, is created by the nudity and the movement?
>
> **Dr. Hanna:** Yes.

June 19, 2014 Evidentiary Hearing Transcript,  ("June Hrg. Tr.") at 32-33.  Therefore, as the

Sixth Circuit explained in *J.L. Spoons I,* "Rule 52 has a minimal impact on the marketplace of ideas because persons desiring to perform mainstream works of art involving nudity and sexual activity may do so in an establishment that is not licensed to sell liquor."  538 F.3d at 384.

## A. Evidence of Secondary Effects

Turning to the requirement that Rule 52 serve a substantial governmental interest, the Court, as discussed above, must apply the *Alameda Books* burden-shifting analysis.  When a district court is faced with analyzing a regulation targeting adverse secondary effects, the regulation at issue is usually challenged just prior to, or immediately after, the effective date of the regulation.[6]  The court therefore does not have an opportunity to analyze evidence of the regulation's actual impact on adverse secondary effects.  Here, because of the unique procedural history of the case, Rule 52 has been in effect since September 8, 2010.[7]  As a result, this case

---

[6] *See e.g., 84 Video/Newsstand, Inc. v. Sartini*, 2011 FED App. 0655N, 455 F. App'x 541, 546 (6th Cir. 2011) ("On October 17, 2007, the day § 2907.40 went into effect, the twelve Plaintiffs filed suit seeking a temporary restraining order (TRO), preliminary injunction, permanent injunction, and declaratory judgment."); *Entm't Prods., Inc. v. Shelby Cnty.*, 2009 FED App. 0406P, 588 F.3d 372, 377 (6th Cir. 2009) ("On January 25, 2008 -- prior to the expiration of the 120-day grace period for obtaining licenses -- Plaintiffs filed suit in the United States District Court for the Western District of Tennessee against Shelby County and the City of Memphis, seeking injunctive relief and a declaratory judgment."); *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 2005 FED App. 0270P, 411 F.3d 777, 380 (6th Cir. 2005) (One month after the Board of Trustees of Union Township enacted Resolution No. 99-15, Deja Vu filed its complaint "alleging that various provisions of Resolution No. 99-15 violate the First and Fourteenth Amendments to the United States Constitution.").

[7] As part of the Court's August 26, 2010 order dismissing Plaintiffs' as applied challenge, the Court stayed the enforcement of Rule 52 until September 8, 2010 to permit Plaintiffs to seek relief, including a stay, from the Sixth Circuit.  On August 27, 2010, Plaintiffs filed a Notice of Appeal.  On the same day Plaintiffs also filed a Motion for an Injunction Pending Appeal under Rule 8(a) of the Federal Rules of Appellate Procedure, which requires plaintiffs to seek injunctive relief pending appeal in the first instance in the district court.  The Court denied Plaintiffs' motion (Doc. # 87), and Plaintiffs did not seek a stay from the Sixth Circuit.

presents the Court with a rare opportunity to evaluate what impact, if any, regulations such as Rule 52 have on adverse secondary effects.

Plaintiffs argue that "[t]he evidence on which [the State] rel[ies] is not sufficient to support the rationale for Rule 52's statewide ban on nudity and touching on premises licensed to serve alcohol."  (Doc #: 62-1 at 4.)  Additionally, Plaintiffs contend that the expert testimony of Daniel Linz, Ph.D. regarding his study of adverse secondary effects casts direct doubt on the State's rationale for Rule 52.  *Id.* at 14.  The Court disagrees with both contentions.

Under the first step of the *Alameda Books* burden-shifting analysis, the State must have a reasonable evidentiary basis for concluding that Rule 52 would ameliorate adverse secondary effects.  Courts have recognized that "combating the harmful secondary effects associated with nude dancing [is] undeniably important," which include violent, sexual, and property crimes. *Pap's A.M.*, 529 U.S. at 296; *see also Richland Bookmart*, 555 F.3d at 524.

The Sixth Circuit has shed light on a state's burden for establishing that it has a reasonable basis to conclude that the regulation will combat adverse secondary effects.  In *Entm't Prods.,* the Sixth Circuit upheld a similar ordinance that requires "adult oriented establishments" to obtain a license and regulates the manner in which entertainment may be provided.[8]  721 F.3d at 732-33.  The panel held that the government's burden, "[a]lthough not extraordinarily high, this evidentiary burden requires that the state show that the evidence upon which it relied was reasonably believed to be relevant to the problem that the entity sought to address."  *Id.* at 734

---

[8] The limitations include: (1) prohibiting nudity; (2) prohibiting certain sexual activities, touching of certain anatomical areas, and all physical contact during performances; (3) prohibiting the sale or consumption of alcohol on the premises; and (4) requiring that all performances take place on a stage at least 18 inches above floor level and that all performers stay at least six feet away from customers and other performers.  *Id.*

(citing *729, Inc v. Kenton Cnty. Fiscal Ct.*, 515 F.3d 485, 491 (6ᵗʰ Cir. 2008) (quoting *Renton*, 475 U.S. at 51-52) (internal quotations marks omitted). "[T]here is no hard-and-fast rule that the government have *any* empirical data directly supporting a link between a given regulation and the secondary effect it is purported to ameliorate." *Id.* (emphasis in original). "[T]he state may rely upon *any* evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest." *Id.* at 739 (quoting *Alameda Books*, 535 U.S. at 438 (plurality opinion) (emphasis added) (quoting *Renton*, 475 U.S. at 51-52) (internal quotation marks omitted). Evidence includes "land-use studies, prior judicial opinions, surveys of relevant professionals (such as real-estate appraisers), anecdotal testimony, police reports, and other direct and circumstantial evidence." *Id.* (quoting *84 Video/Newsstand*, 455 F. App'x at 549).

Here, the State has shown that the evidence it relied upon provided it with a reasonable basis for believing that Rule 52 would combat adverse secondary effects that result when there is nude dancing at establishments that serve alcohol. The State presented the Court with several types of evidence that it relied upon, both from a 2003 public hearing that the Ohio Liquor Control Commission (the "Commission") conducted before enacting Rule 52 and at the 2004 preliminary injunction hearing before the Court. The record shows that when promulgating Rule 52, the State relied on cases and a study regarding nudity in liquor-serving establishments and testimonials from people with experiences in these businesses.[9] For instance, at the 2003 public

_____

[9] At the 2004 preliminary injunction hearing, the State introduced a study from Adams County Sheriff's Department in Colorado, which found that there was a direct correlation between the increases in crime, the increases in alcohol related offenses, and the increased transiency of the patronage for businesses of this nature. 2004 Preliminary Injunction Hearing, Exhibit U at 3. The study concluded "that nude entertainment establishments were an attractant

13

hearing, the Commission heard testimony from Bruce A. Taylor, an attorney with experience in prosecuting vice crimes, including obscenity, prostitution and liquor violations.  Transcript of 2003 Public Hearing, Exhibit 1 to Doc. # 18 at 11.  Mr. Taylor testified that criminal activity, including drug trafficking and prostitution, occurs more frequently in and around liquor-serving establishments that have nude dancing than those that do not provide nude dancing.  *Id.* at 18. Specifically, "[t]he amount of prostitution, the amount of drug traffic, the amount of fights and brawls that occur in and around bars or juice bars that have nude dancing is an escalated statistical number, and it's not sort of an uncommon or unreasonable result to imagine, because sexual performances tend to excite sexual thoughts and feelings in men who are the predominant customers of these kinds of places."  *Id.*

Plaintiffs argue that the State has not relied on evidence that shows that covering the nipple and areola areas of the female breast, as required by Rule 52, will reduce adverse secondary effects.  As noted above, at the April 14 Evidentiary Hearing, Plaintiffs' witnesses, Messrs. Flaig and StJohn, testified that their main objection to Rule 52 is the portion of the Rule that requires female dancers to wear, at a minimum, pasties.  Specifically, Mr. StJohn testified that he does not think there is any evidence that establishes a connection between dancers at

---

to a class of patronage which was very much undesirable to the good citizens of Adams County and represented a very real danger to the safety of the nearby residential citizenry." *Id.*  The State further supported its position with a Memorandum of Law by the National Law Center for Children and Families that summarizes several significant court cases involving the regulation of adult entertainment in liquor-serving establishments.  2004 Preliminary Injunction Hearing, Exhibit X.  Additionally, at the 2003 public hearing, the Commission heard testimony from Ed Duvall, a member of the Ohio Department of Public Safety's Investigative Unit.  Mr. Duvall testified that the combination of nudity and the consumption of alcohol increases secondary effects crime around adult cabarets.  Transcript of 2003 Public Hearing, Exhibit 1 to Doc. # 18 at 74-76.

14

adult cabarets wearing pasties, as opposed to being fully topless, and criminal activity:

> **Court**: So the only objection you have to Rule 52 is the showing of the female breast with less than fully opaque covering over the nipple and areola?

> **Mr. StJohn:** That's a main concern of mine. All the rest, sexual activity --

> **Court:** The rest of Rule 52 you don't have a problem with.

> **Mr. StJohn:** Sexual activity and all those other rules should be on the books, no question about that. I'm not going to condone that type of activity. If it's in there, I can live with that. Someone has to prove to me why we're doing the things we're doing. If there's a reason to that, Judge, I'll understand. Somebody has to --

> **Court:** Bottomless, you know, covering the lower portions, you don't have a problem with that?

> **Mr. StJohn:** I don't. Actually I like that.

> **Court:** So what you're saying is that you don't see any, any effect on any criminal conduct whether or not the establishment permits the entertainers to be fully topless or wear pasties.

> **Mr. StJohn:** None whatsoever. I just don't. I mean, it just baffles me but, you know, stranger things have happened.

April Hrg. Tr. at 117. Following Mr. StJohn's testimony, Plaintiffs' counsel stated that, while his clients were not abandoning their objections to Rule 52's other prohibitions, this requirement "was especially indefensible as a matter of evidence and constitutional law." *Id.* at 127.

At the June 19 Evidentiary Hearing, Plaintiffs presented additional testimony concerning Rule 52's requirement that dancers at adult cabarets wear, at a minimum, pasties. Mss. Molter and Russell testified that covering the areola and nipple areas of the female breast takes away from the "beauty of breasts." June Hrg. Tr at 42, 47. Ms. Molter also testified that wearing pasties distracts from the "sensual fantasy" she tries to create during her performances. *Id.* at 42. In addition, Dr. Hanna testified that she has counted "18 kinds of messages" that are conveyed

15

by the nude breast; such as, honesty, independence, lack of pretense and eroticism. *Id.* at 26.

The Court credits the testimonies of Mr. StJohn, Mr. Flaig, Dr. Hannah, Ms. Molter and Ms. Russell; however, it finds that Rule 52's requirement that dancers at establishments that serve alcohol wear, at a minimum, pasties, passes constitutional scrutiny. First, in *Pap's A.M.,* the Supreme Court found that the "requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." *Pap's A.M.*, 529 U.S. at 301 (internal citations omitted). Second, a plurality of the Court in *Pap's A.M.* rejected the dissent's view that the City of Erie must come forward with evidence showing that pasties and G-strings reduce crime:

> As to the second point -- whether the regulation furthers the government interest -- it is evident that, since crime and other public health and safety problems are caused by the presence of nude dancing establishments like Kandyland, a ban on such nude dancing would further Erie's interest in preventing such secondary effects. To be sure, requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but O'Brien requires only that the regulation further the interest in combating such effects. Even though the dissent questions the wisdom of Erie's chosen remedy, 'the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems,' . . . . It also may be true that a pasties and G-string requirement would not be as effective as, for example, a requirement that the dancers be fully clothed, but the city must balance its efforts to address the problem with the requirement that the restriction be no greater than necessary to further the city's interest.

529 U.S. at 300-01 (internal citations omitted).

The evidence establishes that the State has met its burden under the first step of the *Alameda Books* burden-shifting analysis. The State passed Rule 52 to advance a government interest that the Supreme Court has recognized to be important. The State relied upon a variety of evidence that it reasonably believed demonstrated that establishments that serve alcohol and

permit nude dancing are susceptible to adverse secondary effects.  As the Supreme Court recognized in *Pap's AM,* the government must be allowed a reasonable opportunity to experiment with solutions to address undesirable secondary effects associated with nude dancing in an environment that sells alcohol.  Here, the State has decided to address this problem by requiring that dancers wear, at a minimum, pasties and G-strings.  Thus, the first factor of the *Alameda Books* analysis is satisfied.

Turning to the second step of the *Alameda Books* analysis, the Court finds that Plaintiffs have not met their burden.  The evidence put forth by Plaintiffs, the testimony of Dr. Linz and the study he performed, does not cast direct doubt on the secondary-effects rationale advanced by the State.

Dr. Linz's study involved analyzing criminal activity incidents occurring within a 500-foot radius of adult cabarets in the cities of Toledo, Cleveland and Dayton.  2013 Linz Expert Report ("2013 Linz Report").  In order to be included in the study, the adult cabaret had to be open for a period of 32 months, immediately before and after Rule 52 went into effect, and it had to be within a geographical area where police records existed.  All of the adult cabarets satisfying these requirement were included in the study.  As for the controls, they were comprised of non-adult establishments that served alcohol by the drink.[10]  *Id.* at 3.  For every adult cabaret, Dr. Linz chose one non-adult establishment that was closest to the adult cabaret. In total, Dr. Linz collected data on 13 adult cabarets and 13 control non-adult establishments.  *Id.* at 2-3.

---

[10] Controls had to be no more than 2.5 miles away from the adult business, but also not closer than 1000 feet from any adult business or control.  *Id.* at 3.

Dr. Linz separated the crime data into three categories:  (1) "Person Crimes;" (2) "Property Crimes;" and (3) "Societal Crimes."[11]  *Id.* at 2.  For each category, Dr. Linz calculated the "weighted average" and the "unweighted average."  *Id.* at 4-7.  Both numbers represent the gross average number of crime incidents that occurred within a 500-foot radius of the adult cabaret or control.  December 17, 2013 Evidentiary Hearing Transcript, Doc. # 116 at 9 ("Dec. Hrg. Tr.").  However, for the "weighted average," Dr. Linz also assigned each crime incident a numerical value depending on its proximity to the adult cabaret or control.[12]  *Id.* at 74.  Based on his analysis of the data, Dr. Linz arrived at two conclusions in his report.  First, he concluded that "often crime events are more frequent at non-adult alcohol serving control locations compared to adult alcohol serving locations."  2013 Linz Report at 7.  Second, he concluded that "the implementation of Rule 52 has had little to no effect reducing the amount of crime in the vicinity surrounding the adult cabarets."  Dec. Hrg. Tr. at 78.

As an initial matter, in *Entm't Prods.*, the Sixth Circuit found that Dr. Linz's work "is a minority viewpoint within the secondary-effects literature," and "federal court is simply not the appropriate forum for Dr. Linz and his colleagues to wage methodological combat with other studies on the secondary effects of adult speech."  721 F.3d at 738.  Even taking Dr. Linz's study in the most favorable light, it fails to cast direct doubt on the State's contention that adverse

---

[11] (1) "Person Crimes" includes murders, assaults, and similar crimes; (2) "Property Crimes" includes burglaries, criminal mischief, shoplifting, auto thefts, and other property crimes; and (3) "Societal Crimes" includes alcohol or drug intoxication, possession of narcotics, prostitution, etc.  *Id.*

[12] For example, a robbery that occurred 100 feet away from an adult cabaret would have been given more weight than a robbery that occurred 300 feet away.

secondary effects result when there is nudity at establishments that serve alcohol.

First, as Dr. Linz admitted during his testimony, much of his data for Dayton and Toledo is inconclusive.  When Dr. Linz collected data from the police department in Dayton, there was only one adult cabaret that satisfied the requirements of his study.  Dec. Hrg. Tr. at 60. Therefore, Dr. Linz testified that, because his data on Dayton is based on only one adult cabaret and control site, it is "the least reliable indicator."  *Id*.  As for Toledo, Dr. Linz admitted that his data on Person Crimes is also inconclusive.  Dr. Linz's data on Person Crimes in Toledo shows that there was a dramatic increase in the number of Person Crimes that occurred in Toledo after Rule 52 went into effect, for both adult cabarets and non-adult establishments. *Id.* at 99.  Dr. Linz admitted that the only conclusion that can be drawn from this data is that, after Rule 52 went into effect, there was an overall increase in the number of Person Crimes that were being committed in Toledo:

> **The Court:** It looks like there was a huge increase in the intensity of person crimes [in Toledo][13] in both surrounding cabarets and the control group.  All right. You are talking about factors of three to four times.  Is that right?
>
> **Dr. Linz:** That is correct, your Honor.
>
> **The Court:** So I am not sure what you can draw from table 1, other than Toledo became a whole lot more dangerous in the three years since 2010 than before no

---

[13] In his report, Dr. Linz included the below table for Person Crimes in Toledo, which is referred to as "Table 1":

| Point Source | Weighted Average | Unweighted Average |
|---|---|---|
| Adult Businesses (01/15/08-09/07/10) | 3.85 | 12 |
| Adult Businesses (09/08/10-05/01/13) | 14.82 | 37.5 |
| Non-Adult Bars and Nightclubs (01/15/08-09/07/10) | 4.42 | 10.5 |
| Non-Adult Bars and Nightclubs (09/08/10-05/01/13) | 12.89 | 30.25 |

2013 Linz Report at 4.

matter where you were downtown.

**Dr. Linz:** I think that is correct, your Honor.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The Court:** So I guess I am a little hard to understand your general conclusion for Toledo and Cleveland that Rule 52 has no effect. Isn't it more nuance[d], that it seems to have effect on some type[s] of crime but not to others?

**Dr. Linz:** Well, I would say when we combine the weighted average and unweighted averages and we look across all crime categories, that in effect sometime[s] things go up; sometimes things go down. And that overall, it would be my best conclusion that the effect for Rule 52 was not significant.

**The Court:** But isn't it a fact that someone looking at this data could draw a different conclusion? Say, for example, you could say, all right, looking at Toledo – I don't know what you draw quite frankly for person crime intensity . . . . There is nothing in any of your other charts like table 1, correct, that is kind of a dramatic increase or decrease in crime.

**Dr. Linz:** That is correct, your Honor.

**The Court:** So, you know, as a scholar and analyst, professor, when something seems aberrational, it requires further analysis, correct.

**Dr. Linz:** I would be interested in doing further analysis, that is correct.

Dec. Hrg. Tr. at 99, 103-104.

Second, one can draw multiple conclusions from Dr. Linz's data, including conclusions that directly contradict Dr. Linz's.  For instance, Dr. Linz concludes that "for the most part crime rates either remained constant or increased in the areas surrounding the adult businesses from the pre Rule 52 to post Rule 52 period."  2013 Linz Report at 7.  However, if one were to ignore the data that Dr. Linz admitted is inconclusive,[14] Person Crimes in Cleveland is the only category where there was not a decrease in crime incidents after Rule 52 went into effect.  After Rule 52

---

[14] As noted above, Dr. Linz admitted during his testimony that the data for Dayton and the Person Crimes data for Toledo is inconclusive.

went into effect, there was a decrease in crime incidents for Property Crimes and Societal Crimes

in Toledo and Cleveland.[15]  As to Societal Crimes in Cleveland, Dr. Linz testified that a decrease

in crime incidents after Rule 52 went into effect could support the conclusion that Rule 52 had a

positive impact on secondary effects crimes in this category:

> **The Court:**  I am saying the control group [for Societal Crimes in Cleveland] went from 10 before Rule 52 to 12 after[,] unweighted 28 to 30.[16] All right. So I will call it a modest increase, but for the cabarets, you have virtually identical, no change weighted and a modest decrease unweighted. So it is either no impact or slight reduction in crime, depending on whether you use weighted or unweighted versus the control group where crime went up. So could not one draw the conclusion that, at least for societal crimes in Cleveland, Rule 52 had a positive effect?
>
> **Dr. Linz:**  I would draw the conclusion that there is little to suggest an effect either way.
>
> **The Court:**  All right. Well, are you saying that if I look at the data and draw the conclusion I did, that I have drawn the wrong conclusion?
>
> **Dr. Linz:**  No, your Honor, I would not.

Dec. Hrg. Tr at 106-107.  Therefore, similarly, the decrease in crime incidents around adult

cabarets in the other categories also supports the conclusion that Rule 52 has had a positive

---

[15] The decrease in crime incidents around adult cabarets in these categories was based on either the unweighted average or weighted average, and in many instances on both.

[16] In his report, Dr. Linz included the below table for Societal Crimes in Cleveland:

| Point Source | Weighted Average | Unweighted Average |
|---|---|---|
| Adult Businesses (01/28/08-09/07/10) | 5.15 | 17.13 |
| Adult Businesses (09/08/10-04/18/13) | 5.03 | 14.25 |
| Non-Adult Bars and Nightclubs (01/28/08-09/07/10) | 10.04 | 28.25 |
| Non-Adult Bars and Nightclubs (09/08/10-04/18/13) | 12.02 | 30.12 |

2013 Linz Report at 6.

impact on secondary effects crimes in these categories.

To refute Dr. Linz's report and conclusions, the State presented the testimony of Dr. Richard McCleary and a report he and Dr. Wendy Regoeczi authored.  Drs. McCleary and Regoeczi disagree with the methodology that Dr. Linz used in his study.  Their main criticism of Dr. Linz's study concerns his methodology for choosing control sites.  They posit that Dr. Linz's analysis and conclusions are flawed because he did not carefully choose control sites.  In their report, Drs. McCleary and Regoeczi opine that Dr. Linz's conclusion "assumes that 13 [adult cabaret] and Control sites are comparable, of course, and . . . they are not even *roughly* comparable.  This raises serious questions about the validity of Dr. Linz'[s] . . . conclusion.  If Control sites were *not* carefully selected to be *similar* to [adult cabaret] sites, [adult cabaret]-Control differences are expected."   McCleary & Regoeczi 2013 Expert Report ("2013 McCleary Report") at 3 (emphasis in original).

In addition, Dr. McCleary testified that his analysis of the crime data that Dr. Linz gathered shows that Rule 52 reduced crime by seven percent.  Dec. Hrg. Tr. at 199.  Dr. McCleary cautioned that due to the size of the study, the seven percent calculation has an error rate of eleven percent, which is above the five percent error rate that scholars strive to achieve in a well-conducted study.  *Id.* at 200.  Nonetheless, Dr. McCleary noted that "if you went to the legislature and told them that you had some program that would reduce crime in the State of Ohio by 7 percent, they would write a check."  *Id.* at 207.  Based on their analysis of Dr. Linz's data, Drs. McCleary and Regoeczi concluded that:

> Although the evidence taken as a whole suggests that Rule 52 had [a] positive effect – or at worst, a benign effect – Dr. Linz arrives at the contrary conclusion. Ignoring reductions in nine Cleveland and Dayton sites, for example, Dr. Linz focuses on increases in four Toledo sites to argue that the effects of Rule 52 were

negative. One can always find small subsamples that are larger and smaller than average, of course. Based on the entire sample, however, and on the average of all thirteen sites, Dr. Linz'[s] contrary opinion is flawed.[17]

2013 McCleary Report at 13.

Similar to *Entm't Prods.*, "[a]t best, the [Plaintiffs] have demonstrated that the [State] faced a choice between two reasonable alternative viewpoints when assessing the need for the challenged regulations." 721 F.3d at 738-39. As discussed above, the State has established that it relied on multiple evidentiary sources to support its rationale that enacting Rule 52 will combat adverse secondary effects. In response to that evidence, Plaintiffs attempt to "cast direct doubt" on the State's rationale by relying on Dr. Linz's report. However, despite his conclusions in his report, during his testimony, Dr. Linz admitted that much of his data is inconclusive. Dr. Linz also admitted that multiple conclusions can be drawn from his data, including a conclusion that supports the State's rationale for enacting Rule 52. "The [Plaintiffs] effectively ask [the Court] to second-guess the deliberative judgments of [the State]." *Id.* at 739. Like the court in *Entm't Prods.*, the Court refuses to do so.

### C. Direct Evidence of Criminal Activity

The State offered compelling evidence in support of Rule 52 through the testimony of Andrew Bouza under a related but distinct theory. Agent Bouza testified that, while working undercover in adult cabarets located in Toledo, he observed criminal activity occurring within

---

[17]Similarly, when the Court asked Dr. McCleary whether Dr. Linz's data supports his overall conclusion that Rule 52 has had no impact on secondary effects crime, Dr. McCleary responded that it did not. Dr. McCleary went on to explain that "[the data] is very strained. [Dr. Linz] was able to arrive at that conclusion because he sliced and diced everything up. You can take any large sample or before-after sample and cut it up into small enough segments so that you basically have a hodge podge of results. His findings are very, very confusing." Dec. Hrg. Tr. at 202.

adult cabarets that were not complying with Rule 52's requirement that dancers cover the areola and nipple areas of their breasts. The State contends that the combination of alcohol with nude dancing increases the probability of sexual activity, prostitution and unlawful drug transactions on the premises themselves.

Mr. Bouza has worked as an Enforcement Agent for the Investigative Unit since July 2010. Dec. Hrg. Tr. at 150. The Investigative Unit is responsible for enforcing Title 43 of the Ohio Revised Code, the portion of the Code that deals with issues related to liquor permits. *Id.* Mr. Bouza generally handles cases dealing with "[u]nderage sales, underage drinking, . . . drug sales, prostitution, gambling, food stamps, [and] food stamp fraud" and has conducted undercover investigations in five adult cabarets located in or near Toledo.[18] *Id.* at 150, 182. During the course of his investigation, Mr. Bouza witnessed sexual activity between dancers and other criminal activity in establishments that served alcohol and permitted fully topless dancing:

> Q: Generally, for the Court, the locations with this nude dancing, can you describe generally the setup or how it works from what you've observed?
>
> A: Out on the main dance floor, there is a main dance stage. Typically, when you go in, most of the girls will go up either by themselves or with another girl up on stage. Their first song they will typically dance in like a G string bottom with a bra or bikini top style covering. Their second song, they typically take off the top to expose their naked breasts and continue on with their second song.
>
> Q: And what types of activity outside of just the dancing have you observed in these locations?

---

[18] Four of the adult cabarets are located in Toledo, and one is located in Bucyrus. At the time of Mr. Bouza's investigation, the four cabarets located in Toledo had a liquor permit and the cabaret located in Bucycrus served alcohol, even though it did not have a liquor permit. Four of the investigations that Mr. Bouza conducted are closed cases; the Commission imposed significant fines on three of the cabarets, and it revoked the liquor permit of the fourth cabaret. At the time of his testimony, the fifth investigation that Mr. Bouza was involved with was an open case, and Mr. Bouza did not provide the name of the adult cabaret. *Id.* at 182-86.

> A: I have seen dancers lay other dancers on the stage, suck on their naked breasts, put their mouths on their clothed genitals, go over to the side of the stage, pull up female patron shirts, suck on their naked breasts . . . .

Dec. Hrg. Tr. at 156-57.  Mr. Bouza testified that during a "private dance," (a one-on-one dance between a patron and dancer typically in a private room or blocked-off area away from the general stage) "there were incidents where a female dancer would place her mouth over my clothed genitals, [and] either hum or blow hot air through [my] jeans."  *Id.* at 168.  Mr. Bouza even "paid two female dancers to perform oral sex on each other for additional money" and has also witnessed patrons engage in sexual acts with the dancers:

> Q: Did you observe patrons engage in sexual activity with these dancers?
>
> A: Yes, I did. I was in a private dance where right across from me within three feet there was a male patron, his pants were down by his ankles.  A female, her bottoms were off and having sex with him right next to me. I let the dancer know, I said, "do you see what's going on?" She says "yeah, we got girls that do that." On my way out, they have a manager that keeps track of the number of songs that girls give dances to so they can get their money.

*Id.* at 169.

In addition, Mr. Bouza testified, in responding to questions from the State's attorney, that he has witnessed solicitation of prostitution and narcotics trafficking:

> Q. Have you ever had occasion to discuss hiring a dancer for sex during your investigations?
>
> A. Yes.
>
> Q. And where did these solicitations occur?
>
> A. For the most part, in the private dance room.
>
> Q. Okay. And that would still be on the permit premise?
>
> A. Correct.

Q. Have you ever been lured by drugs at these locations?

A. Yes.

Q. And where do these drug transactions occur?

A. Usually, they are set up out on the general dance floor, but the transactions take   place in the private dance room.

Q. And that's still in the permit location?

A. Correct.

Dec. Hrg. Tr. at 162.

When asked whether he has observed dancers appearing to be intoxicated or impaired, Mr. Bouza responded that he has, and when asked how he could tell that they were intoxicated, Mr. Bouza stated that "they use chairs, tables, and walls to support themselves as they are walking.  I had a dancer tell me that she was so intoxicated one night that she fell down and broke her tooth in the women's restroom." *Id*. at 158.

Mr. Bouza also testified about his experiences in establishments that do not offer nude dancing. *Id.* at 181.  Mr. Bouza testified that he has never witnessed prostitution or dancers engaging in unlawful sexual activity at these establishments.  *Id*.  In establishments where Mr. Bouza has witnessed dancers engaging in unlawful sexual activity, cabarets where women were dancing fully nude, Mr. Bouza testified that the dancers consumed alcohol with the patrons and that every 10 to 15 minutes he was approached by a dancer or wait staff to buy the dancers a drink.  *Id*. at 157-58.  It is not surprising that when alcohol is consumed in an environment where there is nude or topless dancing, inhibitions of both dancers and patrons are lowered.  This can lead to patrons and dancers engaging in unlawful sexual activity.  Mr. Bouza's testimony, therefore, provides direct evidence that the product of nude or topless dancing and alcohol

creates an environment conducive to unlawful sexual activity, prostitution and drug trafficking,
criminal behavior that the State clearly has an interest in curtailing.

The report and testimony of Plaintiff's expert, Dr. Hanna, actually provides support for
this conclusion.  In her report, Dr. Hanna discusses the messages that are communicated by
nudity in exotic dance, including, "messages of eroticism, temptation and allurement, pretense of
sexual availability and longing."  2014 Hanna Expert Report at 8.  In addition, at the June 19
Evidentiary Hearing,  Dr. Hanna testified that the "whole notion" of adult entertainment
businesses is to create the fantasy of intimacy that exists in the bedroom.  June Hrg. Tr. at 27.
These messages, which the nude dancers are trying to convey, when coupled with the lowering
of inhibitions brought on by patrons and dancers consuming alcohol, increases the likelihood that
the unlawful sexual contact and conduct that Agent Bouza discussed during his testimony will
occur.

In response to Agent Bouza's testimony, at the April 14 Evidentiary Hearing, Plaintiffs
presented the testimony of Greg Flaig.  Mr. Flaig provided extensive testimony about his
involvement with BACE and the Coalition.  BACE is a legal organization that "makes the
owners in the state aware of the larger laws and how they're going through the legislature."
April Hrg. Tr. at 22.  The Owners Coalition is an organization made up of forty-seven adult
cabarets that "operate under certain systems and programs . . . [to] mak[e]sure that the club is
working under the law as it should."  *Id.* at 8-9.  Members of the Coalition are subject to the
Coalition's Due Diligence Program, a program that the Coalition set up to ensure that its
members are operating in compliance with the law.  *Id.* at 11.  For instance, to address the
Coalition's concerns with human trafficking, the Program requires members to "sign off" on the

Coalition's Human Trafficking Manual.  *Id.* at 16.  In addition, members are required to post "the Human Trafficking sign" in every dressing room.  *Id.*  As part of the Due Diligence Program, club owners and managers have to perform an audit, "a very thorough 10-page document" that covers "all aspects" of what law enforcement and human resource programs are concerned with.  *Id.* at 13.  The audit is comprised of a list of questions that address the requirements of the Due Diligence Program.  For instance, one of the questions that is part of the audit is "Are the 'Human Trafficking' Signs Posted?"  April 14 Evidentiary Hearing, Exhibit 8, Due Diligence Program Manual.  If a member of the Coalition is not in compliance with the Coalition's Due Diligence Program, it runs the risk of having its membership in the Coalition revoked.

Mr. Flaig provided testimony about the adult entertainment businesses that were the subject of Agent Bouza's investigation and testimony.  Mr. Flaig testified that, after being cited by the Commission, two of the adult cabarets that Agent Bouza investigated, Hush and Fantasy Land, joined the Coalition.  April Hrg. Tr. at 24-25.  Since joining the Coalition, the Commission has not issued any citations to Hush and it has issued only one citation to Fantasy Land.  *Id.* at 25.

Mr. Flaig also testified about the process by which dancers are able to perform at adult cabarets.  In Ohio, dancers are not employees of the adult cabarets where they perform. Rather, a dancer who wants to perform at a particular cabaret, will, prior to her performance, enter into a lease agreement with the cabaret's manager, the Entertainment Tenant Lease ("Lease Agreement").  *Id.* at 38-39.  The Lease Agreement allows the dancer to lease space within the cabaret (the area in which the dancer is permitted to perform is limited to the space that she

28

leases).  *Id.*  Mr. Flaig explained that "the lease itself is set up so that they have total autonomy and control over their own entertainment function."  *Id.* at 39.  For instance, nothing in the lease prohibits a dancer, when she's not performing on stage, from receiving and consuming an alcoholic beverage purchased by a customer.  *Id.* at 43.

The Court finds that while Mr. Flaig's testimony is informative as to the efforts that adult entertainment businesses are making to comply with Rule 52, it is not sufficient to counter Mr. Bouza's testimony.  First, Mr. Flaig testified that approximately sixty percent of the adult cabarets in Ohio are members of the Coalition.  *Id.* at 35.  Therefore, assuming that membership in the Coalition helps to prevent criminal activity that occurs within adult cabarets, nearly half of the adult cabarets in Ohio are not members of the Coalition.  For the adult cabarets that are not part of the Coalition, Rule 52 is necessary to deter criminal activity that may be caused by the combination of nude dancing and the consumption of alcohol.

Second, while Mr. Flaig's testimony establishes that the Coalition's Due Diligence Program is aimed at deterring criminal activity within adult cabarets, there is no evidence that the Program, in isolation, is adequate to deter this criminal activity.  Mr. Flaig testified that sometime around 2010, after Rule 52 went into effect, he began tracking the number of adult cabarets that received liquor citations for unlawful sexual conduct.  *Id.* at 65.  According to Mr. Flaig, in the four-year period that Rule 52 has been in effect, the Commission has only issued twenty-four citations for unlawful sexual conduct.  *Id.* at 80.  Mr. Flaig testified that this is a relatively low number considering that there are "over 3,000 young ladies that entertain per night" at more than 100 clubs.  *Id.*  This suggests to the Court that as a result of various efforts, including Rule 52 and the Coalition's Due Diligence Program, criminal activity within adult

cabarets has decreased.  The Court posed this suggestion to Mr. Flaig:

> **Court**: Mr. Flaig, just picking up on what you said at the very end, you said "For the entire state we have almost full compliance, we've come so far in four years. Enforcement people gave me the answers."  What I take from that is that Rule 52 and the combination of State enforcement and then your effective due diligence and compliance has -- serves to keep prostitution, sex acts and drug trafficking out of the adult entertainment business. Is that a fair way to put it."

*Id.* at 84-85.  Mr. Flaig responded that he did not agree.  *Id.*  In explaining why he did not agree with the Court's conclusion, Mr. Flaig stated that "when it really boils down to Rule 52, Rule 52 is a superfluous law . . . because if it didn't exist tomorrow, the very enforcement agencies, such as vice and all the others, would be able to arrest people and put them away when they break [the law]."  *Id.* at 86.  The Court comes to the opposite conclusion.  As noted above, Agent Bouza's testimony established that the product of nude or topless dancing and alcohol creates an environment conducive to criminal activity.  There is no evidence that in the absence of Rule 52 the Due Diligence Program would adequately deter this criminal activity.  In addition, Mr. Flaig's response misses the point.  Rather than "arrest people and put them away when they break [the law]," the State has decided to address the problem by eliminating at least one of the causes of the criminal activity that occurs within adult cabarets.

### III.

For the forgoing reasons, the  Court finds that Rule 52 serves a substantial governmental interest.  The evidence establishes that the State, when it promulgated Rule 52, had a reasonable evidentiary basis for concluding that nude dancing in adult cabarets leads to undesirable secondary effects.  Dr. Linz's report and testimony concerning the impact of Rule 52 does not "cast direct doubt" on the State's secondary effects rationale.  In addition, the State has presented evidence that the combination of nude dancing with the consumption of alcohol by dancers and

30

patrons increases the likelihood of criminal activity within the premises of adult cabarets.

Accordingly, the Court upholds Rule 52 and dismisses Plaintiffs' as applied challenge.


IT IS SO ORDERED.

*/s/Dan Aaron Polster 7/9/14*
**Dan Aaron Polster**
**United States District Judge**

31